### AFFIDAVIT OF JOHN D. PITTENGER

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS | ) |
| | ) ss.: |
| MIDDLESEX COUNTY | ) |

I, John D. Pittenger, being duly sworn, do hereby depose and state as follows:

1.     I am the Executive Vice President for Finance and Administration ("<u>VP</u>") and the Chief Financial Officer ("<u>CFO</u>") of CTC Communications Group, Inc. ("<u>CTC Group</u>"), a corporation organized under the laws of the State of Delaware. CTC Group is the direct parent of CTC Communications Corp., a Massachusetts corporation ("<u>CTC Communications</u>" and collectively, with CTC Group, <u>CTC</u>"). CTC is an integrated communications provider of voice, data and internet communications services predominantly to medium and larger-sized business customers.

2.     I have been employed by CTC since 1989. In my capacity as VP and CFO, I am familiar with CTC's day-to-day operations, business affairs and books and records. I have personal knowledge as to the facts stated below, except for those as to which are specified to be stated on information and belief and, as to those, I believe them to be true.

**A.    <u>Margin Calls and Employee Loans</u>**

3.     In or about the spring of 2000, several officers and other employees of CTC personally obtain margin loans using their CTC common stock as collateral (so-called "<u>Margin Loans</u>"). A true and accurate copy of the schedule of Margin Loans (as of June 2002) is attached hereto as <u>Exhibit A</u>.

4.     At the time that certain of these Margin Loans were obtained, the market price of CTC's stock was in excess of $35.00 per share. However, the market price of high tech and telecommunications stocks fell dramatically in the summer and fall of 2000. CTC's stock

declined in proportion to the market. In November 2000, as the market price fell below $10.00,
the officers and employees began to receive so-called "margin calls" (that is, demands from the
lender to pay down the loans or to put up additional CTC stock or other collateral to secure
repayment of the loans).

5.     The officers and employees were notified by the lender (Paine Webber) that if
CTC's stock price were to fall below $3.00, their margin loans would be called and payable in
full and that if the officers and employees were unable to pay the outstanding loan amount within
a certain period of time, each person's shares pledged against his/her loans would be sold to the
extent necessary to generate proceeds sufficient to satisfy such person's outstanding loan
balance.

6.     CTC estimated that the aggregate number of shares that would have been sold to
satisfy the margin calls would have been approximately 400,000 – 500,000 shares. Given the
fact that CTC's average day trading volume at the time was approximately 50,000 shares, selling
over 400,000 shares on the market would have driven CTC's stock price down even further,
which could have necessitated the sale of even more shares to satisfy the margin calls.

7.     As the amount of these loans increased, CTC made a number of inquiries to the
investment banking and institutional investment community soliciting interest in an "off-market"
sale of shares to mitigate the loans. However, there was no interest in an "off-market" purchase
due to the uncertainty in the market.

8.     To enable its officers and employees to avoid the rapid sale of their CTC stock at
low prices to satisfy margin calls, CTC's Board of Directors (the "Board") authorized CTC's
making of short-term loans to the officers and employees in order to cover margin calls and
avoid a situation where insiders would have to quickly sell a significant amount of shares (the

"Employee Loans"). The Employee Loans made by CTC to its employees and officers under this program totaled $6,375,135.

9.    The Employee Loans were described in CTC's Form 10-K filed with the Unites States Securities and Exchange Commission ("SEC") for the nine (9) month transition period ending December 31, 2000 ("Form 10-K"). True and accurate copies of the relevant pages of the Form 10-K are attached hereto as Exhibit B.

**B.    Promissory Notes and Security for Repayment**

10.    The officers and employees understood that the Employee Loans were to be repaid. Also, CTC's credit facility with Toronto Dominion Bank required the Employee Loans to be negotiated at arms length and secured by collateral.

11.    Certain of the officers and employees executed promissory notes evidencing their respective Employee Loans owed to CTC. A schedule of those Promissory Notes is attached hereto as Exhibit C. The promissory notes include a term of 12 months and bear an annual interest rate of 10.75% and were otherwise in customary form and on fair and customary terms.

12.    As security for repayment of the Employee Loans, CTC obtained forms of collateral from the various officers and employees. For example, Thomas Fabbricatore CTC's former Vice President – Business Systems, pledged to CTC his common stock in Telecom Realty, LLP ("Telecom"), a real estate syndicate, to secure his obligation to repay approximately $395,000.

13.    Michael Donnellan, CTC's former Vice President – Field Operations, granted to CTC a mortgage on property located at 312 Phillips Road, Sandwich, Massachusetts as security for three promissory notes in the aggregate amount of approximately $643,000. The Board had

previously rejected as insufficient Donnellan's original offer to pledge his stock in Telecom before agreeing to accept the mortgage on the Sandwich property.

14.     Likewise, Robert Fabbricatore, CTC's former President and CEO, executed a Stock Pledge Agreement from the Robert J. Fabbricatore Family Limited Partnership pledging one million shares of CTC's common stock as security for repayment of his Employee Loan in the amount of $4.5 million. Robert Fabbricatore also authorized the assignment of $5 million from a life insurance policy for the purpose of repaying any outstanding loans due to CTC in the event of his death prior to full repayment.

15.     CTC also sought collateral from Frederick Kunzi, a former Vice President and Chief Technology Officer, to secure his approximately $304,000 indebtedness. However, Mr. Kunzi represented that he did not have any collateral to provide at the time.

C.    **Outstanding Officer Loans and Collection Efforts**

16.     Certain of the officers and employees have repaid, in whole or part, their obligations under the promissory notes. Specifically, Anthony Vermette, the current Vice President of Sales, has fully satisfied his approximately $340,000 loan obligation. Similarly, Robert Fabbricatore has fully satisfied his $4.5 million loan obligation. Steve Milton, former President and Chief Operating Officer of CTC, has repaid all but approximately $10,000 of his original $300,000 loan. However, CTC has withheld Milton's severance check, which was sufficient to cover the outstanding balance due and owing.

17.     As of the date of this Affidavit, however, certain other officers and employees have not satisfied their obligations under the promissory notes, despite demands by CTC.

18.     CTC never forgave or cancelled any of the outstanding Employee Loans, never agreed that any of the obligors on the Employee Loans could avoid paying them in full, and

always considered each of the Employee Loans to be valid and fully owing in all respects, all consistent with the representations made in CTC's filings with the SEC.

So stated under oath this _24_ day of August, 2004.

_____
John D. Pittenger

Commonwealth of Massachusetts    )
                                 )  ss:
Middlesex County                 )

Then came before me the above-named John D. Pittenger, who stated before me that the foregoing statements are true and accurate to the best of his knowledge and belief, this _24_ day of _AUG._, 2004.

_____
Notary Public

#1272066 v\1 - harrisrl - r9j601l.doc□ - 24183/1

MY COMMISSION EXPIRES
OCTOBER 22, 2004



**EXHIBIT A**

**Officers Loans A/C #1245**
**June 30, 2002**

| Name | Paid Out | Loan | Notes | Daily | Interest Receivable 12/31/01 | Interest FY 02 | Interest Receivable EOM | Total Balance EOM |
|---|---|---|---|---|---|---|---|---|
| Frederic Kunzi | 7/28/00 | 50,000.00 | 10.75% | 14.73 | 7,672.26 | 2,665.41 | 10,337.67 | 60,337.67 |
| | 10/23/00 | 25,000.00 | 10.75% | 7.36 | 3,202.91 | 1,332.71 | 4,535.62 | 29,535.62 |
| | 10/25/00 | 50,000.00 | 10.75% | 14.73 | 6,376.37 | 2,665.41 | 9,041.78 | 59,041.78 |
| | 10/31/00 | 70,000.00 | 10.75% | 20.62 | 8,782.60 | 3,731.58 | 12,514.18 | 82,514.18 |
| | 11/27/00 | 29,000.00 | 10.75% | 8.54 | 3,407.90 | 1,545.94 | 4,953.84 | 33,953.84 |
| | 12/1/00 | 79,882.00 | 10.75% | 23.53 | 9,293.12 | 4,258.37 | 13,551.49 | 93,433.49 |
| | | 303,882.00 | | | 38,735.16 | 16,199.41 | 54,934.57 | 358,816.57 |
| Steve Milton | 2/11/02 | 300,000.00 | 10.75% | 88.36 | 0.00 | 12,281.51 | 12,281.51 | 312,281.51 |
| | 3/28/02 | (100,000.00) | 10.75% | (29.45) | 0.00 | (2,768.49) | (2,768.49) | (102,768.49) |
| | 4/29/02 | (104,064.38) | 10.75% | (30.65) | 0.00 | (1,930.89) | (1,930.89) | (105,995.27) |
| | 5/2/02 | (86,000.00) | 10.75% | (25.33) | 0.00 | (1,494.40) | (1,494.40) | (87,494.40) |
| | | 9,935.62 | | | 0.00 | 6,087.72 | 6,087.72 | 16,023.34 |
| Mike Donaghue | 11/1/00 | 200,000.00 | 10.75% | 58.90 | 25,034.25 | 10,661.64 | 35,695.89 | 235,695.89 |
| | 11/27/00 | 80,500.00 | 10.75% | 23.71 | 9,459.85 | 4,291.31 | 13,751.16 | 94,251.16 |
| | 12/1/00 | 362,466.00 | 10.75% | 106.75 | 42,167.71 | 19,322.42 | 61,490.12 | 423,956.12 |
| | | 642,966.00 | | | 76,661.80 | 34,275.37 | 110,937.18 | 753,903.18 |
| Tom Fabbricatore | 6/25/01 | 90,000.00 | 10.75% | 26.51 | 5,036.30 | 4,797.74 | 9,834.04 | 99,834.04 |
| | 7/3/01 | 60,000.00 | 10.75% | 17.67 | 3,216.16 | 3,198.49 | 6,414.66 | 66,414.66 |
| | 2/11/02 | 245,243.00 | 10.75% | 72.23 | 0.00 | 10,039.85 | 10,039.85 | 255,282.85 |
| | | 395,243.00 | | | 8,252.47 | 18,036.08 | 26,288.54 | 421,531.54 |
| TOTALS | | 1,352,026.62 | 0.00 | | 123,649.43 | 74,598.58 | 198,248.02 | 1,550,274.64 |
| | | 0.00 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | 0.00 | 0.00 | 0.00 | 0.00 |

# EXHIBIT B

*CORP*
*F 31R_*

```
<SUBMISSION>
<TYPE> 10-K
<DOCUMENT-COUNT> 4
<SROS> NASD
<FILER>
<CIK> 0001092319
<CCC> rv$ik3ks
</FILER>
<PERIOD> 12/31/00
<DOCUMENT>
<TYPE> 10-K
<DESCRIPTION> 12/31/00 10-K
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

FORM 10-K

ANNUAL REPORT UNDER SECTION 13 OR 15(d)
OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the nine month transition period ended December 31, 2000

Commission File Number 0-27505.

CTC COMMUNICATIONS GROUP, INC.
(Exact name of registrant as specified in its charter)

Delaware                              04-3469590
(State or other jurisdiction of       (IRS Employer
incorporation or organization)        Identification No.)

220 Bear Hill Rd., Waltham, Massachusetts    02451
(Address of principal executive offices)    (Zip Code)

(781) 466-8080
(Registrant's telephone number including area code)

Securities registered pursuant to Section 12(b) of the Act:
    None.

Securities registered pursuant to Section 12(g) of the Act:
    Common Stock.

Indicate by check mark whether the registrant (1) has filed all
reports required to be filed by section 13 or 15(d) of the
Securities Exchange Act of 1934 during the preceding 12 months
(or for such shorter period that the registrant was required to
file such reports), and (2) has been subject to such filing
requirements for the past 90 days.    Yes    [X]    No

Indicate by check mark if disclosure of delinquent filers pursuant
to Item 405 of Regulation S-K is not contained herein and will not
be contained, to the best of registrant's knowledge, in definitive
proxy or information statements incorporated by reference in Part
IV of this Form 10-K or any amendment to this Form 10-K.    [X]

Based on the closing sale price on March 22, 2001, the aggregate
market value of the voting stock held by non-affiliates of the
Registrant was approximately $115,592,655.

At March 22, 2001, 26,735,384 shares of the Registrant's Common
Stock were outstanding.

<PAGE>
3. Property and Equipment

   Property and equipment, at cost, and related accumulated depreciation
and amortization balances are as follows:

| | December 31, 2000 | March 31, 2000 |
|---|---|---|
| Furniture, fixtures, vehicles and equipment.........$ | 5,922,131 | $ 5,455,042 |
| Network and related equipment...................... | 115,141,984 | 80,536,390 |
| Leasehold improvements............................. | 21,170,502 | 3,660,732 |
| Fiber and related equipment........................ | 17,627,621 | - |
| Assets under capital lease ........................ | 99,753,175 | 30,952,729 |
| | 259,615,413 | 120,604,893 |
| Less accumulated depreciation and amortization...... | 63,873,598 | 29,369,433 |
| | $195,741,815 | $91,235,460 |

   Assets under capital lease principally consist of $65.0 million of network
and related equipment, $12.7 million of fiber and related equipment, $10.4
million of furniture and fixtures, $10.0 million of buildings and $1.6
million of leasehold improvements. Amortization expense of capital lease
assets is included in depreciation expense. Capitalized interest of
$3,659,000 and $415,000 were recorded in the nine months ended December 31,
2000 and the fiscal year ended March 31, 2000, respectively.

4. Related-Party Transactions

   The installation of certain telecommunications equipment and certain
related activities are generally subcontracted to a company in which the
Chairman of the Company is the major shareholder. In addition, equipment is
purchased from this company. Amounts paid to this company for hardware and
services, based on fair market value, aggregated $3,928,713, $1,361,430 and
$499,257 during the nine months ended December 31, 2000 and the years ended
March 31, 2000 and 1999, respectively.

   The Company leases office space from a trust in which the Chairman is a
beneficiary. Rent expense for these facilities aggregated $38,688, $51,584
and $125,904 during the nine months ended December 31, 2000 and the years
ended March 31, 2000 and 1999, respectively. One of those leases expired
during fiscal 1999. The remaining lease expires during fiscal 2002.

   The Company subleases space to a company controlled by the Chairman of
the Company. Terms of the sublease are identical to those included in the
Company's lease. Sublease rental income totaled $100,862, $108,326 and
$106,293 during the nine months ended December 31, 2000 and the years ended
March 31, 2000 and 1999, respectively.

   In May 2000, the Company entered into a 15 year lease for approximately
71,250 feet from a limited liability company in which two executive
officers, including the Chairman, own a majority of membership interests,
and in which three executive officers each own a minority membership
interest. The payments under this lease were $1,162,982 for the nine months
ended December 31, 2000.  The Company has funded an escrow account guarantee
for this lease in the sum of $2.5 million as well as a security deposit of
$889,050 as of December 31, 2000. This lease has been accounted for as a
capital lease.

PAGE?

As of December 31, 2000, the Company had advanced funds to certain stockholders, who are executives and officers, amounting to $6,375,135 evidenced by fully secured promissory notes. These notes bear interest at 10.75%. During March 2001, $5,414,676 was repaid together with interest due and $960,459 of these loans remains outstanding.

5. Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses consist of the following:

|  | December 31, 2000 | March 31, 2000 |
|---|---|---|
| Trade accounts payable and accrued telecommunication costs. | $41,174,477 | $39,701,538 |
| Sales tax payable........ | 7,209,500 | 6,337,569 |
| Other accrued expenses.... | 1,077,573 | 289,650 |
|  | $49,461,550 | $46,328,757 |

6. Financing Arrangements

In September 1998, the Company entered into an agreement providing for a revolving line of credit agreement (the "Revolving Line of Credit") with a consortium of lenders, providing for a three year senior secured credit facility of up to $75,000,000. Advances under the Revolving Line of Credit were subject to interest at the prime rate plus 1.75% per annum. The outstanding debt was secured by all the Company's assets excluding those acquired through purchase money financing. The Company paid a one-time up front fee of $2,531,250, representing 3.375% of the facility. This one-time up front fee was capitalized as a deferred financing cost and amortized as interest expense over the term of the Revolving Line of Credit. Warrants to purchase an aggregate of 1,161,618 shares of the Company's common stock at an exercise price of $4.50 per share were issued to the lenders in connection with the transaction. The fair value of the warrants of $1,909,848 was amortized and included in interest expense over the term of the Revolving Line of Credit. Borrowings under the Revolving Line of Credit were repaid from the senior secured credit facility obtained in March 2000 and described below.

In October 1998, the Company entered into a three year vendor financing facility (the "Vendor Financing Facility"). Under the terms of the agreement, the Company agreed to a $25,000,000 volume purchase commitment from this vendor. Outstanding borrowings were subject to interest at 12.5% per annum. Borrowings under the Vendor Financing Facility were repaid from the senior secured credit facility consummated in March 2000 described below.

In March 1999, the Company entered into an unsecured credit facility (as amended on June 30, 1999, the "Credit Facility") with a bank. Under this Credit Facility, the Company was allowed to borrow up to $30,000,000. Warrants to purchase 103,824 shares of the Company's common stock at an exercise price of $7.875 were issued in connection with the Credit Facility. The fair value of the warrants of $329,468 to purchase 103,824 shares of common stock was capitalized and was amortized ratably over the term of the Credit Facility as interest expense. This facility has been repaid.

F-15

51

**EXHIBIT C**

**Schedule of Promissory Notes**

| Maker | Date of Note | Principal Amount ($) | Due Date |
|---|---|---|---|
| Michael Donnellan | 11/01/00 | 200,000 | 11/01/01 |
| | 11/27/00 | 80,500 | 11/27/01 |
| | 12/01/00 | 362,466 | 12/01/01 |
| Robert J. Fabbricatore | 04/13/00 | 300,000 | 04/13/01 |
| | 11/01/00 | 2,721,716 | 11/01/01 |
| | 12/01/00 | 1,543,912 | 12/01/01 |
| Thomas Fabbricatore | 11/27/00 | 15,100 | 11/27/01 |
| | 12/01/00 | 401,963 | 12/01/01 |
| Frederic Kunzi | 07/28/00 | 50,000 | 07/28/01 |
| | 11/27/00 | 29,000 | 11/27/01 |
| | 10/23/00 | 75,000 | 10/23/01 |
| | 10/31/00 | 70,000 | 10/31/01 |
| | 12/01/00 | 79,882 | 12/01/01 |
| Anthony Vermette | 11/27/00 | 83,200 | 11/27/01** |
| | 12/01/00 | 257,091 | 12/01/01 |
| ** Paid in full (01/04/01) | | | |