**EXHIBIT A**

Frederic F. Kunzi

1

```
 1                                          Volume:  I

 2                                          Pages:  1-77

 3              UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5                  (EASTERN DIVISION)

 6   - - - - - - - - - - - - - - - - - -x

 7   In re:

 8   CTC COMMUNICATIONS GROUP, INC., CTC

 9   COMMUNICATIONS CORP., CTC COMMUNICATIONS

10   OF VIRGINIA, INC., CTC COMMUNICATIONS    Chapter 11

11   LEASING CORP.,                 Case No. 02-12873 (PJW)

12              Debtors        (Jointly Administered)

13   CTC LITIGATION TRUST,

14              Plaintiff,

15   vs.                            Civil Action No.

16   FREDERIC F. KUNZI,             04-CV-10881(RWZ)

17              Defendant.

18   - - - - - - - - - - - - - - - - - -x

19           DEPOSITION OF FREDERIC F. KUNZI

20            Monday, October 17, 2005

21         Brown Rudnick Berlack Israels LLP

22      One Financial Center, Boston, Massachusetts

23            Commencing at 10:07 a.m.

24      Reporter:  Karen A. Morgan, CSR/RPR
```

Frederic F. Kunzi

17

1    testified that you were first hired by CTC in 1998; is

2    that correct?

3        A.    Yes.

4        Q.    And your position was at least when you were

5    first hired chief technology officer?

6        A.    That's correct.

7        Q.    And what was your starting salary in '98 when

8    you were hired?

9        A.    You received my contract.  You should have

10   this information.

11            MR. GLICKMAN:  If you could just answer

12   questions.  Whether he has the information or not, you

13   can answer the question.

14       A.    The reason I mention that I believe it was --

15   I'm not sure if it was 175 or 185.

16       Q.    Actually, I don't think I do have your

17   contract.  If you can produce that if you have it.

18            MR. GLICKMAN:  I'll get that to you.

19            MR. HARRIS:  Okay.

20       Q.    And can you describe generally what your

21   responsibilities were as CTO when you were first hired

22   by CTC?

23       A.    Yes.  I had two main responsibilities.  One

24   was to be the chief technology officer and help the

Frederic F. Kunzi

22

1    was an industry award for the best network built in

2    2002.  We filed a patent.  I mentioned that earlier.

3    It is still pending so I personally on my side believe

4    I delivered to CTC above what was required from me

5    from A to Z and we can talk later about it.  I think

6    CTC did not deliver what they promised to me.  We can

7    talk about this later on.

8         Q.    Okay.  As I'm sure your counsel has explained

9    to you, at least in the context of this lawsuit, the

10   services you provided to CTC are not really in

11   question.

12        A.    I hope so.

13        Q.    I appreciate the clarification.

14        A.    I think it is important for you to

15   understand.

16        Q.    And I appreciate that.  I appreciate that.

17   You mentioned that you had moved 150 people or so

18   through various stages of the services you provided to

19   CTC.

20        A.    Yes.

21        Q.    How many people as best you can recall did

22   you supervise or did report to you?

23        A.    They reported to me essentially were all the

24   people who were in charge of technology or IT reported

Frederic F. Kunzi

23

1   to me at CTC.

2        Q.    How many people do you recall was that?

3        A.    At the peak it was 150 people.

4        Q.    To whom did you report?

5        A.    I report to Bob Fabbricatore, the CEO of the

6   company.

7        Q.    You were a direct report to him?

8        A.    Yes.

9        Q.    Did you have any contact with the company's

10  board of directors?

11       A.    In the early days I was part of the board,

12  not officially part of the board but I was invited to

13  come to the board and made presentation, talked about

14  progress we made, about issues we had so, yes, I had

15  but aside of the board meetings, I did not have direct

16  contact with the board members.

17       Q.    You were not an official member of the board.

18  You would go to board meetings to make presentations?

19       A.    As an officer I was there particularly in the

20  early days, yes.

21       Q.    Part of the services you described was that

22  in connection with the build-out of the so-called power

23  path network?

24       A.    Yes indeed.   That was the name.

Frederic F. Kunzi

25

1    Q.    We will talk about that shortly.

2    A.    But that's back to the questions about

3  salary.  Salary reduced but in compensation stock

4  options.

5          MR. GLICKMAN:  He asked you a question

6  though did your salary stay the same.

7          MR. HARRIS:  Yes.  That was the original

8  question.

9    A.    All right.  I believe my salary went from 175

10  to 185 after a year and a few months I believe.  That

11  may not -- dates may not -- I'm trying to --

12   Q.    As best you can recall.  That's fine.

13   A.    Exactly.  The rest was there was some bonuses

14  coming in, you know, 50,000 bonus I think in year two,

15  of that order of magnitude, but very much the idea was

16  to gain wealth through stock.

17   Q.    In that regard you agreed to accept a lower

18  base salary in exchange for additional CTC stock for an

19  overall larger compensation package?

20   A.    Yes.

21   Q.    Is that fair to say?

22   A.    Absolutely.

23   Q.    Your employment with CTC ended in or about

24  2003?

Frederic F. Kunzi

26

1    A.    It ended before CTC filed for bankruptcy.

2    Q.    So that would have been 2002.  I'm sorry.

3    A.    Which is an important point when you look at

4    my contract.  CTC did not deliver on my severance

5    package which is a value of about $300,000.

6          MR. GLICKMAN:  Try to just listen to the

7    question and just try to focus on the question.

8    A.    Ask your question again.

9    Q.    Yes.  When did your employment with CTC end?

10    A.    It ended on October 1, 2002.

11    Q.    As you have noted, that was a day or so

12    before CTC filed Chapter 11 bankruptcy protection.

13    A.    Absolutely.

14    Q.    And do you recall what your salary was at the

15    time that your employment with CTC ended?

16    A.    I believe it was 185 still.

17    Q.    All right.  You were the chief technology

18    officer at the time?

19    A.    Yes.

20    Q.    And were you laid off?

21    A.    Yes.  I was laid off.

22    Q.    This was in connection with a number of

23    layoffs?

24    A.    I was probably the last officer to be laid

Frederic F. Kunzi

27

1    off aside from the CFO who was still onboard.

2        Q.    That was Mr. Pittinger?

3        A.    Yes.

4        Q.    With respect to your CTC stock, when did you

5    first acquire CTC stock?

6        A.    You know, probably '99 and then in 2000 and

7    you said first so that's my answer.

8        Q.    And how much did you acquire in '99?

9        A.    It was probably in -- I believe it was in

10   November '99.  Probably the stock was about -- I

11   exercised stock and it was at 383 I believe for about a

12   hundred thousand dollars.  So it's about -- what could

13   it be?  25,000 plus.  Something like that.

14       Q.    Okay.  In 2000 how many shares did you have?

15       A.    How many shares did I have?  In 2000 I have

16   125,500 shares to be exercised between '99 and the end

17   of 2000.  The good times.

18       Q.    Okay.  For the entire telecom industry I

19   imagine.

20       A.    Yes.

21       Q.    2001.

22       A.    I exercised some stock and sold some stock to

23   pay my taxes.  As you know, each year we pay taxes and

24   I couldn't remember exactly how many but it was enough

Frederic F. Kunzi

33

1   account with Paine Webber.

2       Q.   Was Paine Webber the brokerage you used in

3   connection with your CTC stock?

4       A.   Yes.

5       Q.   What type of account was this?

6       A.   What type of account?

7       Q.   Let me ask a different question.  What did

8   you do use Paine Webber for generally?  What did they

9   do?

10      A.   Just for as a broker.  Sorry.  Just as a

11  broker.  Not a bank.

12      Q.   Okay.  And who was Mike Jonah?

13      A.   Mike Jonah was the broker working for Paine

14  Webber.  He was my contact.

15      Q.   Did you have a margin account with Paine

16  Webber?

17      A.   Yes.  At the time where margin calls came in

18  obviously we -- well, I'm not so sure.  You know, I

19  have to try to understand your question now.  When you

20  say I have a margin account, what do you mean?

21      Q.   Well, describe for me the type of account you

22  had.

23      A.   He was a broker.  Things went well until I

24  got margin calls.  Then CTC jumped in and that's

Frederic F. Kunzi

34

1   essentially the whole sorry.

2       Q.    You anticipated where I'm going.  Just before

3   we get into that, when did you first open your account

4   at Paine Webber?

5       A.    When did I?

6       Q.    First open an account at Paine Webber.

7       A.    Probably when I started to exercise stock so

8   it's probably in late '99.  I'm not sure about that

9   anymore.

10      Q.    So at some point 2000, 2001, whenever, the

11  price of telecom stocks in general and CTC stock in

12  particular started to drop precipitously; is that

13  correct?

14      A.    That's correct, yes.

15      Q.    And did you receive a margin call as a result

16  of that among other things perhaps?

17      A.    Yes.

18      Q.    Do you recall when you received your first

19  margin call?

20      A.    No, I don't.  I would think probably either

21  somewhere in 2001.  I would think but I don't recall

22  exactly.

23      Q.    Okay.  What is your understanding of a margin

24  call?

Frederic F. Kunzi

47

1    conceptually skipping a step here.  What happened with

2    the margin calls?  How were the margin calls addressed?

3        A.   Well, the calls came in.

4        Q.   Okay.

5        A.   And I talked to Bob.  He said don't worry.

6    We stick together.  We'll fix it, pay for it.

7        Q.   Who paid for it?

8        A.   The company.

9        Q.   The company paid for.  All right.  We are

10   skipping over the obvious but so the record is clean,

11   you got the margin calls.  You had this conversation

12   with Bob.  Your recollection of the conversation is Bob

13   said to you, Frederic, don't worry about it.  We'll

14   take care of it.  What that ultimately turned out

15   being, and correct me if I'm wrong, is that the company

16   paid the margin calls on your behalf; is that correct?

17       A.   Yes.

18       Q.   Do you recall what amount the company paid on

19   your behalf?

20       A.   Well, back to your earlier questions.  There

21   were steps and I don't recall exactly the amounts but,

22   you know, it ended up to be 300 plus.

23       Q.   Okay.  And do you know whether the company

24   paid the margin calls on behalf of other officers and

Frederic F. Kunzi

48

1    employees of the company?

2        A.    I don't know for sure.   I would think but I

3    don't know.

4        Q.    Okay.   So the company when they paid your

5    margin calls did they give the money to you?

6        A.    Oh, no.

7        Q.    To pay Paine Webber or did they go to

8    straight to Paine Webber?

9        A.    It went straight to Paine Webber.

10       Q.    But it was ostensibly on your behalf to cover

11   your margin calls; is that correct?

12       A.    Yes.

13       Q.    Now in connection with that, with the payment

14   by CTC of the margin calls, were you asked to execute

15   promissory notes?

16       A.    On the first -- actually on the first I

17   don't remember exactly but I signed one set of notes

18   once and that was it.   I believe it was a six-month,

19   you know, how do you -- how would I say that?   A

20   six-month note which I signed.

21       Q.    Who specifically at the company approached

22   you regarding signing a promissory note?

23       A.    Well, it was John Pittinger came to my office

24   and can you sign that and it is again my Swiss view if

Frederic F. Kunzi

49

1   you borrow money, you know, sign it and I signed it

2   without even putting too much thought behind it.

3       Q.   When did he approach you, first approach you

4   with the promissory notes?

5       A.   I don't recall exactly but, you know, if you

6   have access to -- I don't recall exactly.  That's my

7   answer.

8       Q.   Just in terms of a time line, did he approach

9   you about the notes after -- obviously after the margin

10  calls were paid on your behalf?

11      A.   Yes.

12      Q.   Did he approach you after the conversation

13  you had with Bob about the forgiveness?

14      A.   Yeah, probably.

15      Q.   Okay.

16      A.   Probably because I had so many conversations

17  about that, yes, probably.  He came relatively late so

18  yes, I would say so.

19      Q.   Let me ask you this.  You had this

20  conversation with Bob about forgiveness.  Pittinger

21  comes to you later asking you to execute notes.

22      A.   Yes.

23      Q.   Promissory notes in connection with the

24  repayment by CTC.

Frederic F. Kunzi

50

1          A.    Yes.

2          Q.    Did you say to Pittinger, time out.  Bob told

3   me I didn't have to pay this.  I'm not signing this

4   note.

5          A.    No, I did not and I think it was a matter of

6   sequence as you are just trying to allude to but he was

7   saying I'm working on it in the early days so he was

8   working on this forgiveness, and these notes arrived

9   so, frankly, to be very frank, I don't recall exactly

10  all the sequences and when everything happened here.

11  It is difficult for me to say yes or no I mean.

12         Q.    Okay.  The time notwithstanding, you execute,

13  as we will look at in a few seconds, you execute a

14  series of promissory notes.

15         A.    Yes.

16         Q.    And it was either John Pittinger or maybe Len

17  Glass or someone come to you and say, Fred, we want you

18  to sign these promissory notes memorializing your

19  obligation to repay us certain monies.

20         A.    Yes.

21         Q.    Did you say to them, Pittinger, Glass,

22  whomever about the promissory notes, Bob Fabbricatore

23  told me I do not have to pay this.  I do not or have

24  concerns about signing a promissory note which says I

Frederic F. Kunzi

51

1  owe this money where Bob Fabbricatore has told me I do

2  not owe this money.  Did you say that?  Did you express

3  concern to Pittinger?

4      A.    A straight answer to your question, probably

5  not.

6      Q.    Okay.

7      A.    I don't think so.

8      Q.    Why is that, sir?

9      A.    I don't recall.  It is a good question.  I

10 don't know at this point.

11              MR. HARRIS:  Please mark this as Exhibit 1.

12              (Exhibit No. 1 marked

13              for identification.)

14     Q.    Mr. Kunzi, you have been handed what has been

15 marked as Kunzi Exhibit 1.  If you will take a moment

16 to review that, please.

17              (Witness perused document.)

18     A.    Was this the first promissory note or was

19 this --

20     Q.    I'm just going by the date.  This is the

21 earliest in time.  I'll say that.

22     A.    Okay.

23     Q.    Your recollection of these events is likely

24 better than mine.

Frederic F. Kunzi

53

1      A.   I don't recall. Yes, probably.

2      Q.   Okay.  So the point I'm trying to make or the

3   question I'm trying to ask rather is that given the

4   terms of this promissory note, it has attorney fees

5   here.  It has costs here.  Did you say -- this is

6   memorializing your obligation here that you signed.

7      A.   Sure.

8      Q.   For $50,000.  Bob Fabbricatore told me I

9   don't have to pay this.  What is your understanding of

10  a promissory note.  Let me ask that first.

11     A.   If I sign it, I owe it generally speaking.

12     Q.   Yes.

13     A.   That's clear but if I get a verbal contract

14  says don't worry about it.  We are going to stick

15  together and you earned or owned that.  You're going to

16  have forgiveness, you know, that's another contract

17  which covers this one.

18     Q.   Well, except this why I asked about the

19  sequence in time because if your conversation with Bob

20  preceded this, I need you to tell me.  I need you to

21  tell me as best you can recall.

22     A.   That's my point.  You asked me under oath

23  here to tell you something I don't recall.  I

24  understand your question but to the best of my

Frederic F. Kunzi

58

1  these notes?

2      A.    No, they never did.

3      Q.    So no one ever asked you to put up any

4  collateral?

5      A.    No.   Nobody ever came and by the way, I don't

6  think I had any to put there but nobody ever asked me.

7      Q.    You had no conversations with anyone about --

8      A.    No, not to my recollection.

9      Q.    Okay.

10     A.    At this point.

11         MR. HARRIS:  Can we go off the record for a

12  second?

13            (Discussion off the record.)

14         MR. HARRIS:  I have handed the court

15  reporter copies of nine additional promissory notes for

16  a total of ten.

17     A.    So we have ten.

18         MR. HARRIS:  We have ten promissory notes

19  as you may recall which were attached to the original

20  complaint.  Counsel has agreed to stipulate to the

21  authenticity of those, of Mr. Kunzi's signature with

22  respect to each of those exhibits and promissory notes.

23  So I would ask the court reporter if you can mark those

24  separately and I'll now provide a copy for the witness

Frederic F. Kunzi

63

1     Q.   It was requested by Mr. Pittinger?

2     A.   Yes.

3     Q.   Okay. Was he by himself when he came in?

4     A.   Yes.

5     Q.   So he came in and describe for me the

6 situation. He comes in. He says -- what does he say?

7 He has this note in his hand, this blank. He says,

8 Fred, I've got this note.

9     A.   I don't recall the conversation but he came

10 in and asked for a signature. That's probably the best

11 way to describe it at this point.

12    Q.   Did you say signature for what? I mean you

13 understood what you were signing; right?

14    A.   You know, it goes back to what you tried to

15 get from me earlier on. Since earlier I don't remember

16 what our discussion was but the purpose of him coming

17 in with these notes into my office was to ask for a

18 signature.

19    Q.   Okay.

20    A.   And I signed them.

21    Q.   What I'm trying to establish is that at the

22 very minimum you understood what you were signing,

23 promissory notes; is that correct?

24    A.   Oh, yes. I understood where we went, yes.

Frederic F. Kunzi

66

1    Q.    Your and Bob's understanding as to your

2    repayment of the loans is a separate issue.  So what

3    I'm trying to understand from you is whether or not the

4    company, the board of directors, for example was aware

5    of the arrangement or contract between you and Bob as

6    to your repayment of the loan.

7    A.    I believe they were but I have no proof for

8    that.  I wasn't in the room and the reason I tell you

9    that is that Bob, the board and everybody knew the

10   value I brought in the company not just in terms of

11   what I delivered but in terms of the knowledge of how

12   the service engine was built.  I became a key figure in

13   the company and they wanted to retain me.  They needed

14   to retain me to ensure success for the future and I was

15   committed with the company.  They knew that.  So that

16   was -- to answer your question, I believe the company

17   knew, not just Bob, about a forgiveness and that there

18   were discussions on that and probably agreements but I

19   have no proof for that.

20   Q.    Did you ever have any conversations with

21   anybody else in the company other than Bob Fabbricatore

22   about this forgiveness arrangement?

23   A.    No, because as I told you earlier, it was not

24   my way to deal with this stuff.  Maybe I should have

Frederic F. Kunzi

67

1    but I didn't.

2            MR. GLICKMAN:  Just to clarify, that would

3    be outside the attorney-client privilege.

4            MR. HARRIS:  Yes.  I mean he has testified

5    earlier he wasn't consulting an attorney

6    contemporaneously with this.

7            MR. GLICKMAN:  I'm talking subsequent to

8    that since I've represented him, whatever.  There's

9    attorney client privileged conversations.

10           MR. HARRIS:  Yes.  I'm not entitled to

11   that.  I understand.  Can we take a short break?  I

12   don't think I have much longer to go but I would like

13   to collect my thoughts.

14                   (A break was taken.)

15       Q.    Mr. Kuniz, other than your salary at -- and

16   you're presently at ACN in Michigan?

17       A.    Yes.

18       Q.    What other sources of income or revenue do

19   you have?

20       A.    None.

21       Q.    Okay.  Do you own your home?

22       A.    No.  It is a mortgage.

23       Q.    Okay.  Do you own any property other than

24   your home?

Frederic F. Kunzi

68

1      A.    I personally don't.

2      Q.    Are you the beneficiary of any insurance

3  policies?

4      A.    Life.  I have a life insurance.  My wife is

5  the beneficiary of the life insurance.

6      Q.    Since the filing of this lawsuit, have you

7  had occasion to speak with Robert Fabbricatore at all?

8      A.    I don't think so.  I saw him -- when did the

9  lawsuit start?

10     Q.    '03.

11           MR. GLICKMAN:  October 2003.

12     A.    No.

13     Q.    You haven't spoken with him?

14     A.    No.

15     Q.    Have you had occasion to speak with him since

16 you received a demand by CTC prior to filing the

17 lawsuit?  I believe that was in June '03.

18     A.    June of which year?

19     Q.    '03.

20     A.    No.

21     Q.    Have you spoken with Bob Fabbricatore at all

22 since you left CTC?

23     A.    Yes.  I went to New Hampshire to see him for

24 an hour.  It was probably in October, November just

Frederic F. Kunzi

69

1    after I was laid off.

2       Q.    Okay.

3       A.    And that's when I saw him.

4       Q.    What was the purpose of that visit?

5       A.    The purpose of the visit was to ask him to

6    sign a letter recognizing that what I shared with you

7    was what he shared with me so many times.

8       Q.    So you went to New Hampshire asking him to

9    memorialize this forgiveness, this understanding of

10   forgiveness that you and him had.

11      A.    Yes.

12      Q.    Did he sign that letter?

13      A.    No.  He referred me to his lawyer.

14      Q.    And who was that?

15      A.    At that time was Len Glass but when I called

16   Len Glass, he was laid off so it was not his lawyer

17   anymore and I left it without following up.

18      Q.    Okay.  So what was Bob's reaction when you

19   asked him to sign this letter memorializing this

20   understanding?

21      A.    He did not deny that this was what he

22   promised me but he was also in a situation which was

23   slightly also critical at the time, whatever it was,

24   and he wanted to be sure that if he does anything, he