**EXHIBIT B**

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| CTC COMMUNICATIONS GROUP, INC., | ) |
| CTC COMMUNICATIONS CORP., | ) Chapter 11 |
| CTC COMMUNICATIONS OF VIRGINIA, | ) |
| INC., and CTC COMMUNICATIONS | ) Case No. |
| LEASING CORP., | ) 02-12873 (PJW) |
| | ) |
| Debtors. | ) (Jointly |
| _____ | ) Administered) |
| | ) |
| THE CTC LITIGATION TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. |
| | ) 04-55756 (PBL) |
| LEONARD GLASS AND THE LAW | ) |
| OFFICES OF LEONARD R. GLASS, | ) |
| P.A., | ) |
| | ) |
| Defendants. | ) |

    Deposition of LEONARD R. GLASS, taken pursuant to notice at the law offices of Bifferato, Gentilotti & Biden, P.A., 1308 Delaware Avenue, Wilmington, Delaware, beginning at 10:04 a.m., on Monday, August 1, 2005, before Julie H. Parrack, Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

ORIGINAL

1    A.    Glen Nelson was an employee. He made an
2  employee loan from the company, but I thought you were
3  talking about the Glen Nelson deal. I mean the
4  Dannellan deal, which was an entirely -- I knew
5  nothing about Nelson's original loan until after the
6  fact.
7    Q.    Okay, we'll talk about each one of these guys
8  separately.
9    A.    Okay.
10   Q.    Unless of course, is there some common
11 knowledge in between --
12   A.    Yes, there is.
13   Q.    Between the two Fabbricatores, Dannellan,
14 Milton and Kunzi?
15   A.    Right.
16   Q.    Robert Fabbricatore, Tom Fabbricatore, Michael
17 Dannellan, Steve Milton and Fred Kunzi received loans
18 from CTC?
19   A.    All of these men had taken margin loans on
20 their CTC stock. And there was a substantial drop in
21 the price of telecom stocks generally, and CTC stock,
22 common stock specifically.
23          The brokerage firm called upon them to
24 meet the margin calls, and management authorized loans

```
1    from the company to these people to pay their margin
2    loans.
3        Q.   And do you recall who the brokerage firm was?
4        A.   Paine Webber.
5        Q.   Paine Webber, okay.  And did CTC have any
6    policy at all with respect to acquisition of sale of
7    company stock?
8        A.   Sure.
9        Q.   And what was the policy?
10       A.   The policy was that -- it wasn't a company
11   policy, it was a Securities and Exchange Commission
12   rule.
13       Q.   Okay, and the rule provided?
14       A.   Rule provided originally that you had to hold
15   common stock for two years before you could sell it,
16   and then the rule was changed for one year, except
17   when it came to 5 percent stockholders, of which
18   Mr. Fabbricatore was one.  And that was the rule.
19       Q.   So when these gentlemen sold their common stock
20   or took out margin loans -- I apologize -- were they
21   in compliance with this SEC provision?
22       A.   I don't know, because I don't know when they
23   took them out.  I was not consulted.
24       Q.   Okay.  At what point did you become aware of
```

```
 1   this?
 2     A.   Mr. Fabbricatore called me up and told me after
 3   the fact what he had done.
 4     Q.   And what did he tell you he did?
 5     A.   That he had, in order not -- he said in order
 6   not to hurt the other stockholders, when all this, by
 7   selling additional shares to meet the margin calls,
 8   he, he would, the public stockholders he didn't want
 9   to hurt, he would lend the money from the, advance the
10   money from the company.
11     Q.   And that was the first you had heard of this
12   whole scenario?
13     A.   That's the first I heard of it.  I told him
14   that the action that he took required the approval of
15   the board of directors.
16     Q.   Okay.
17     A.   The next meeting of the board of directors, he
18   disclosed what he had done.
19     Q.   Okay.
20     A.   The board of directors said that although they
21   didn't think what he did was illegal, it was poor
22   governance and they insisted they set a limit on the
23   amount that could be lent to members of management.  I
24   believe it was 1 million, 108 -- $1,800,000 in the
```

1   future.
2   Q.   Okay.
3   A.   They instructed me to obtain promissory notes
4   and collateral for the loans, which I proceeded to do.
5   Q.   From each of the --
6   A.   From each of the people.
7   Q.   Okay.
8   A.   I interviewed each of the persons and obtained
9   a promissory note from each of the persons, but
10  Mr. Kunzi told me he had no collateral.
11  Q.   Okay.
12  A.   I referred -- I told, I told the board of
13  directors that Kunzi couldn't give collateral.  They
14  advised -- it was the consensus of the board that
15  since Kunzi was such an essential person in the
16  construction of the facilities, the new facilities, to
17  permit it to become a facilities-based carrier, that
18  they would not press him on that.
19  Q.   Press him on the collateral?
20  A.   Press him on the collateral.
21  Q.   But they still expected him to pay, to repay?
22  A.   They still expected him to pay.
23  Q.   And -- I'm sorry, go ahead.
24  A.   And I did get collateral from everyone else.

```
 1      Q.   Okay.  And it was never --
 2      A.   Never adopted.
 3      Q.   -- never adopted, never subject to a vote,
 4   never --
 5      A.   Never, never.
 6      Q.   Just sort of banter at a meeting?
 7      A.   Right, right, right.  And human resources
 8   assisted me and got outside local, Boston counsel to
 9   prepare and review the documents for Dannellan.
10      Q.   Do you recall what law firm did that?
11      A.   No, but human resources will tell you.
12      Q.   Okay.  So it's your understanding as you sit
13   here that the company expected all of them to repay
14   their --
15      A.   The board of directors expected every cent to
16   be repaid.
17      Q.   Okay.  Now, as for Mr. Nelson --
18      A.   Nelson, I was never asked about employee loans
19   because they were small.  Except that there came a
20   time when the auditors said that these loans should be
21   memorialized.  And I believe that I -- Mr. Pittinger
22   asked me to prepare a promissory note for Mr. Nelson
23   and one for Mr. Fabbricatore's secretary.
24      Q.   Miss Dumaine?
```

