UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 02-12873 (PJW) |
| CTC COMMUNICATIONS GROUP, INC., | ) | |
| CTC COMMUNICATIONS CORP., | ) | |
| CTC COMMUNICATIONS OF VIRGINIA, INC., | ) | (Jointly Administered) |
| and CTC COMMUNICATIONS LEASING | ) | |
| CORP. | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | AP No. 03-01494 |
| | ) | |
| | ) | |
| CTC LITIGATION TRUST., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | No. 04-CV-10881 (RWZ) |
| FREDERIC F. KUNZI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CTC LITIGATION TRUST'S MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

This is an action by the CTC Litigation Trust (the "Trust") to collect outstanding principal, accrued and accruing interest, costs and attorneys' fees due and owing from the Defendant Frederic Kunzi pursuant to a series of promissory notes. As set forth more fully below, there are no genuine issues of material fact as to the Defendant's obligations under the promissory notes and, moreover, there is no credible evidence to support any of the Defendant's defenses for having failed to fulfill said obligations. Therefore, summary judgment should enter in favor of the Trust.

1

## II.   UNDISPUTED FACTS

Before its bankruptcy, CTC was a publicly traded company operating as an integrated communications carrier offering voice, data, Internet, and video services in the northeastern United States.  See Complaint, ¶ 4.  CTC, founded by Robert Fabbricatore in 1980, was originally a privately held telephone hardware sales and installation company.  It became a publicly held corporation in or about 1985.

The Defendant was employed by CTC as the Vice President and Chief Technology Officer.  See Excerpts of Deposition Transcript of Frederic F. Kunzi ("Kunzi Tr."), a true and accurate copy of which is attached as Exhibit A to the Affidavit of Robert L. Harris ("Harris Aff."), p. 17.  During his tenure with CTC, the Defendant supervised as many as 150 employees and reported directly to Mr. Fabbricatore, the Chief Executive Officer ("CEO") and Chairman of CTC.  See Kunzi Tr., pp. 22-23.

The Defendant was laid off on October 1, 2002, two (2) days before CTC filed its chapter 11 bankruptcy petition.  See id. at p 26.  At the time of his termination, the Defendant's annual salary was approximately $185,000.  See id.

### A.   Margin Calls and CTC Loans

Like many officers and employees of CTC, the Defendant received shares of CTC common stock as part of his total compensation package.  See id. at p 25.  The Defendant first acquired CTC stock in or around 1999 and owned as many of 125,500 shares during the course of his employment with the Company.  See id. at p 27

In or around 2000, the Defendant, among other officers and employees of CTC, obtained margin loans from Paine Webber using their stock as collateral.  See id. at p. 33; see also Affidavit of John Pittenger ("Pittenger Aff."), at ¶ 3.  At the time that certain of these Margin Loans were obtained, the market price of CTC's stock was in excess of

$35.00 per share.  See id. at ¶4.  However, the market price of high tech and telecommunications stocks, including CTC's stock, fell dramatically in the summer and fall of 2000.  See id.

In November 2000, as the market price of CTC's common stock fell below $10.00, the officers and employees began to receive demands from Paine Webber to pay down the loans or to put up additional CTC stock or other collateral to secure repayment of their Margin Loans (the "Margin Calls").  See id.; see also Kunzi Tr., p. 34; Excerpts of Deposition Transcript of Leonard Glass ("Glass Tr."),[1] a true and accurate copy of which is attached as Exhibit B to the Harris Aff., at pp. 111-112.  CTC estimated that the aggregate number of shares that would have been sold to satisfy the margin calls would have been approximately 400,000 – 500,000 shares.  See Pittenger Aff. at ¶6.  Given the fact that CTC's average day trading volume at the time was approximately 50,000 shares, selling over 400,000 shares on the market would have driven CTC's stock price down even further, which could have necessitated the sale of even more shares to satisfy the margin calls.  See id.

To enable its officers and employees to avoid the rapid sale of their CTC stock at low prices to satisfy margin calls, CTC's Board of Directors (the "Board") authorized CTC's making of short-term loans to the officers and employees in order to cover margin calls and avoid a situation where insiders would have to quickly sell a significant amount of shares (the "Margin Call Loans").  See Pittenger Aff. at ¶ 8; see also Glass Tr., p. 113; Excerpts of Deposition Transcript of John Pittenger ("Pittenger Tr."), a true and accurate copy of which is attached as Exhibit C to the Harris Aff., at pp. 28, 40.  The Margin Call

---

[1] Mr. Glass was deposed in connection with another civil action commenced by the Trust, CTC Litigation Trust v. Leonard Glass and the Law Offices of Leonard R. Glass, P.A., Adv. Pro. No. 04-55756, in the United States Bankruptcy Court for the District of Delaware.

Loans made by CTC to its officers and employees totaled $6,375,135. See Pittenger Aff. at ¶ 8.

The Margin Call Loans were disclosed by CTC in its Form 10-K filed with the Securities and Exchange Commission ("SEC") for the nine (9) month transition period ending December 31, 2000 ("Form 10-K"). See Pittenger Aff., Exhibit B. Moreover, the vast majority of the Margin Call Loans were in fact repaid by the officers and employees to CTC. See id, at ¶¶ 9-15; see also Pittenger Tr., pp. 46, 64-65. Kunzi, however, never repaid his loan obligations.

### B. Execution of Promissory Notes

CTC charged Leonard Glass, outside corporate counsel for the company, with primary responsibility for obtaining promissory notes to memorialize the officers and employees' obligation to repay CTC for the Margin Call Loans. See Glass Tr., p. 114. The Defendant, in particular, executed ten (10) promissory notes in favor of CTC (the "Notes"). A true and accurate copy of the Kunzi Notes are attached to the Harris Aff. as Exhibit D. Each of the Notes include a term of 12 months and bear an annual interest rate of 10.75% and were otherwise in customary form and on fair and customary terms. See Exhibit D to Harris Aff.

The Notes provide that upon Defendant's failure to pay when due any obligation or any portion thereof when due, the Defendant shall be liable for a late charge equal to the lesser of 15% per annum or the highest lawful rate per annum, until the delinquent amount is paid. See Complaint, ¶ 27. The Notes also provide that upon Defendant's failure to pay when due any obligation or any portion thereof when due, the Plaintiff, with 10 days notice, may accelerate the sum evidenced by the Notes. See id at ¶ 28. The

Defendant shall be liable for Plaintiff's reasonable attorneys' fees and costs incurred to enforce the Notes.  See id at ¶ 29.

The Notes are governed by Massachusetts law.  See Exhibit D to Harris Aff.

### C.     CTC Bankruptcy and Establishment of CTC Litigation Trust

As described above, the telecommunications industry experienced significant downturn in or around 2000 that resulted in, among other things, declining capital market access for competitive local exchange carriers such as CTC.  During this period, CTC's financial condition began to deteriorate.  Fabbricatore resigned as CEO and Chairman of the Board on September 16, 2002.

On October 3, 2002 (the "Petition Date"), CTC commenced their cases under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  See Complaint, ¶5. CTC operated its businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

CTC filed its Amended Joint Plan of Reorganization (the "Plan") on or around November 20, 2003.  The Plan was subsequently confirmed by the United States Bankruptcy Court for the District of Delaware (Walsh, J.).  The Plan became "effective" as of December 16, 2003.

Specifically, the Plan provides for the establishment of the Trust to, among other things, resolve, liquidate and realize upon certain assets as the successor to and representative of the Debtors' estates.  These assets include, without limitation, certain causes of action arising under Chapter 5 of the Bankruptcy Code and recovery of loans, advances or other amounts due from any of the Debtors' former employees, and all proceeds from and income earned on any of these assets (the "Retained Actions").

### D.     Demand Letter and Commencement of Litigation

On or around June 3, 2003, CTC sent a letter to the Defendant demanding repayment of the outstanding and accrued interest. See Complaint, ¶31. The Defendant, however, failed to make any such payments. Consequently, CTC filed suit against the Defendant on October 8, 2003 in the United States Bankruptcy Court for the District of Delaware (the "Delaware Adversary Proceeding"). As of the date of the Complaint, the outstanding amount was $397,032.85, plus accrued interest, costs and attorneys' fees. See Complaint, ¶ 45. Interest and costs have continued to accrue.[2]

On or around October 31, 2003, the Defendant filed a motion to transfer venue Delaware Adversary Proceeding to the United States Bankruptcy Court for the District of Massachusetts (the "Massachusetts Bankruptcy Court"). By order dated November 24, 2003, the Delaware Adversary Proceeding was transferred to Massachusetts.

On or around January 30, 2004, the Trust filed an Assented-to Motion to Substitute the Trust for CTC as the party-plaintiff in accordance with the Plan. The Massachusetts Bankruptcy Court entered an order substituting the Trust as party-plaintiff on March 2, 2004. The Defendant subsequently filed a Motion to Withdraw the Reference from the Massachusetts Bankruptcy Court to the United States District Court for the District of Massachusetts (the "Massachusetts District Court") on March 31, 2004. By order dated April 13, 2004, the case was withdrawn to the Massachusetts District Court.

---

[2] As of the date of this motion, the outstanding principal and interest is approximately $500,000, plus costs and fees. However, this amount is offset by a pre-petition claim, based on severance, in the amount of approximately $275,000. Therefore, Kunzi is liable to the Trust for approximately $225,000.

The Defendant filed his Answer on or around March 31, 2004. In his Answer, the Defendant asserts affirmative defenses of fraud in the inducement of the Margin Call Loans and that CTC expressly, and by its actions, forgave the repayment of the Notes.

### III. ARGUMENT

#### A. Summary judgment standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). There is no genuine issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The rule should operate so as to "to isolate and dispose of factually unsupported claims or defenses." See Celotex, 477 U.S. at 323-24 (1986).

In response to a motion for summary judgment, the non-moving party must show with sufficient, "admissible evidence the existence of a dispute as to material facts." See Kourouvacilis, 410 Mass. at 711. To meet that burden, the non-moving party must offer specific evidence, in a form admissible at trial, that actually contradicts the facts asserted by the moving party. See New England Merchants Nat'l Bank v. Kneeland, 8 Mass. App. Ct. 946, 947 (1979).

"[V]ague and general allegations of expected proof" do not satisfy this requirement. See Community National Bank, 369 Mass. at 555-56; Federal Deposit Ins. Corp. v. Csongor, 391 Mass. 737, 742-43 (1984) (the bare assertion of inference raises no genuine issue of material fact); LaLonde v. Eissner, 405 Mass. 207, 209 (1989) ("[M]ere

7

assertions of disputed facts [cannot] defeat the motion for summary judgment."). Moreover, it is not enough for a non-moving party to argue that the moving party's evidence may be disbelieved. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986). "[D]isbelief would not be evidence from which the contrary could properly be found." See Kaitz v. Foreign Motors Co., Inc., 25 Mass. App. Ct. 198, 200 (1987), Anderson, 477 U.S. at 256-57. "Instead, the [party] must present affirmative evidence in order to defeat a properly supported motion for summary judgment." See Anderson, 477 U.S. at 257; see also Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

### B.     The Notes Are Valid and Enforceable.

As a threshold matter, a plaintiff seeking to collect on a promissory note establishes a prima facie case by producing the instrument and proving the signatures. See Loew v. Minasian, 361 Mass. 390, 391 (1972). Once the plaintiff produces the note, the burden is on the defendant to disprove liability by a preponderance of the evidence. See Coupounas v. Madden, 401 Mass. 125, 129 (1987). A party is discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money. See Ord, Inc. v. Hoffman, 1994 WL 369809, at *2 (Mass. Sup. Ct. Jan. 13, 1994).

Here, it is undisputed that CTC paid the Margin Call Loans on the Defendant's behalf and, more importantly, the Defendant executed the Notes memorializing his obligation to repay CTC. See Kunzi Tr., pp. 47-48. Indeed, the Defendant

8

acknowledged and authenticated his signature on each of the Notes and understood the legal significance of his signature. See Kunzi Tr., pp. 53, 58. He testified as follows:

> Q. Did you feel like you were forced to sign these promissory notes?
> A. Well, I can not ask you questions but I was probably – when somebody comes in your office with a promissory note. Please sign. Is it forced? You know, it's a free country as my kids say. I probably could have said, hey, no way and I didn't. To say I was forced is probably strong but it certainly created an environment where my signature was requested is maybe a way of –
> Q. It was requested by Mr. Pittinger?
> A. Yes.
> Q. Okay. Was he by himself when he came in?
> A. Yes.
> Q. So he came in and describe for me the situation. He comes in. He says – what does he say? He has this note in his hand, this blank. He says, Fred, I've got this note.
> A. I don't recall the conversation but he came in and asked for a signature. That's probably the best way to describe it at this point.
> Q. Did you say signature for what? I mean you understood what you were signing; right?
> A. You know, it goes back to what you tried to get from me earlier on. Since earlier I don't remember what our discussion was but the purpose of him coming in with these notes into my office was to ask for a signature.
> Q. Okay.
> A. And I signed them.
> Q. What I'm trying to establish is that at the very minimum you understood what you were signing, promissory notes; is that correct?
> A. Oh, yes. I understood where we went, yes.

See Kunzi, p. 63.

Remarkably, the Defendant claims that he signed the Notes "without even putting too much thought behind it." See Kunzi Tr., pp. 48-49. Under Massachusetts law, the failure to read or to understand the contents of a contract, in the absence of fraud or duress, does not avoid its effects. See Lee v. Allied Sports Associates, Inc., 349 Mass. 544, 550-551 (1965); see also (Farrell v. Chandler, Gardner & Williams, Inc., 252 Mass. 341, 343 (1925) (mere ignorance of the contents of an instrument which a party

voluntarily executes is not sufficient ground for setting it aside); <u>Tiffany v. Sturbridge Camping Club, Inc.</u>, 32 Mass. App. Ct. 173, 175 (1992) (a contract is enforced according to its terms, whether or not a party has read it); <u>Markell v. Sidney B. Pfeifer Foundation, Inc.</u>, 9 Mass. App. Ct. 412, 440 (1980) ("One who knowingly signs a writing that is obviously a legal document without bothering to ascertain the contents of the writing is ordinarily bound by its terms."). In short, the failure to read or understand what he was signing was at the Defendant's own peril.

    **C.**    **The Defendants Has Proffered No Credible Evidence of Fraud in the Inducement.**

To establish fraud in the inducement, a party must establish the elements of common law deceit, which include the misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying. See, e.g., Cummings v. HPG Int'l, Inc., 244 F.3d 16, 22 (1st Cir. 2001); Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003); Plumer v. Luce, 310 Mass. 789 (1942). Applying these standards to the case at bar, the Defendant must show (1) that Fabbricatore or some other CTC representative made knowingly false statements; (2) that those statements were made with the intent to deceive; (3) that those statements were material to his decision to sign the Notes; (4) that he reasonably relied on those statements; and (5) that he was injured as a result of his reliance. The Defendant has not adduced any credible evidence to satisfy of any of the requisite elements of fraud in the inducement. See Roger Williams Grocery Co. v. Sykes, 357 Mass. 485, 489 (Mass. 1970) (burden is on the defendant to prove an affirmative defense of fraud.).

The Defendant has demonstrably failed to establish that Mr. Fabbricatore or any other representative of CTC made knowingly false statements regarding repayment of the Notes. There is nothing in the record to support such an assertion. In fact, the Defendant failed to produce any documents or notes to support this defense and chose not to depose Mr. Fabbricatore in this regard. See Dowd v. Northrop Corp., 1991 U.S. App. LEXIS 15038, at *6 (1st Cir. 1991) (finding that where a nonmoving party's evidence consists "merely of 'conclusory allegations, improbable inferences, and unsupported speculation" summary judgment is appropriate). Moreover, the Defendant admitted that he had "no

proof" that anyone in the company, other than Mr. Fabbricatore allegedly, was aware of the alleged forgiveness:

> Q. Your and Bob's understanding as to your repayment of the loans is a separate issue. So what I'm trying to understand from you is whether or not the company, the board of directors, for example was aware of the arrangement or contract between you and Bob as to your repayment of the loan.
> A. I believe they were but I have no proof for that. I wasn't in the room and the reason I tell you that is that Bob the board and everybody knew the value I brought in the company not just in terms of what I delivered but in terms of knowledge of how the service engine was built. I became a key figure in the company and they wanted to retain me. They needed to retain me to ensure success for the future and I was committed with the company. They knew that. So that was -- to answer your question, I believe the company knew, not just Bob, about a forgiveness and that there were discussions on that and probably agreements but I have no proof for that.
> Q. Did you ever have any conversations with anybody else in the company other than Bob Fabbricatore about this forgiveness arrangement?
> A. No, because as I told you earlier, it was not my way to deal with this stuff. Maybe I should have but I didn't.

See Kunzi Tr., pp. 66-67.

Mr. Glass and Mr. Pittenger, both of whom were integrally involved in securing the promissory notes, have stated unequivocally that CTC had every intention of being repaid by the Defendant. See Pittenger Aff., at ¶18; Glass Tr., p. 120; Pittenger Tr., 60-62, 64. The company manifested this intention by, among other things, disclosing the loans in its annual SEC filings and obtaining collateral from certain of the officers and employees. See Pittenger Aff., at ¶¶ 9-15. More importantly, the vast majority of the Margin Call Loan were in fact repaid to the company. See Pittenger Aff., at ¶16; Pittenger Tr., pp. 46, 64-65.

In view of the testimony from Messrs. Pittenger and Glass – and with the record devoid of anything to substantiate the alleged statements made by Mr. Fabbricatore – the

12

Defendant cannot sustain his burden of proof on the fraud in the inducement defense. See Zyla v. Wadsworth, 360 F.3d 243, 254 (1st Cir. 2004) (finding summary judgment where there was no evidence of fraud in the inducement).

In addition, the fact that the Defendant signed the Notes despite his contention that the obligations were forgiven simply belies logic.  Indeed, the Defendant is loath to explain his own course of conduct:

> Q. Did you say to Pittinger, time out.  Bob told me I didn't have to pay this.  I'm not signing this note.
> A. No, I did not and I think it was a matter of sequence as you are just trying to allude to but he was saying I'm working on it in the early days so he was working on this forgiveness, and these notes arrived so, frankly, to be very frank, I don't recall exactly all the sequences and when everything happened here.  It is difficult for me to say yes or no I mean.
> Q. Okay.  The time notwithstanding, you execute, as we will look at in a few seconds, you execute a series of promissory notes.
> A. Yes.
> Q. And it was either John Pittinger or maybe Len Glass or someone come to you and say, Fred, we want you to sign these promissory notes memorializing your obligation to repay us certain monies.
> A. Yes.
> Q. Did you say to them, Pittinger, Glass, whomever about the promissory notes, Bob Fabbricatore told me I do not have to pay this.  I do not or have concerns about signing a promissory note which says I owe this money where Bob Fabbricatore has told me I do not owe this money.  Did you say that?  Did you express concern to Pittinger?
> A. A straight answer to your question, probably not.
> Q. Okay.
> A. I don't think so.
> Q. Why is that, sir?
> A. I don't recall.  It is a good question.  I don't know at this point.

See Kunzi, pp. 50-51.

The parole evidence rule "bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing." See Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 496 (Mass. App. Ct. 1997).

13

Stated otherwise, the parole evidence rule "makes ineffectual the intention of the parties unless the written contract is not a complete integration of the parties' agreement and the oral agreement is intended to retain an independent collateral existence." See Cotty v. Meister, 339 Mass. 202, 204 (Mass. 1959).

Thus, to the extent that the Defendant contends that the alleged forgiveness was made contemporaneously with the execution of the promissory note, evidence of that oral agreement would be barred by the parole evidence rule. See Sherman v. Koufman, 349 Mass. 606, 609-10 (Mass. 1965) (holding that evidence of an oral agreement releasing liability under promissory notes, made at the time of delivery of such notes, was inadmissible under the parole evidence rule); Santry v. Richman, 6 Mass. App. 955, 956 (Mass. App. Ct. 1978) (where the defendant was barred by the parole evidence rule from introducing, in defense of an action on a promissory note, evidence of an alleged contemporaneous oral agreement between the parties); Trustees of Tufts College v. Parlane Sportswear Co., Inc., 4 Mass. App. Ct. 783, 784 (Mass. App. Ct. 1976) ("oral testimony concerning prior or contemporaneous agreements which allegedly altered the defendant's responsibility from definite to conditional liability was not admissible to vary the terms of the writings under the parole evidence rule").

The case of DiPietro v. Sipex Corp., 2005 WL 1812505 (Mass. Sup. Ct. 2005) is particularly instructive. In DiPietro, a corporation moved for summary judgment on a $250,000 loan made to its employee and secured by a promissory note that the employee executed. See 2005 WL 1812505, at *4. The employee claimed that the then-president and CEO of the company assured him that the loan would be forgiven. See id. The court held because the promissory note was clear and unambiguous, and the parties did not

14

dispute the terms in the note, the note was an integrated agreement and parole evidence was inadmissible to explain the note. See id. Accordingly, the court held that the employee's assertions were no defense to the corporation's attempt to collect on the note. See id. at 4-5. The facts and circumstances of the instant case warrant the same result.

### D.     CTC Did Not Waive The Right to Collect on The Notes.

The Defendant contends that because CTC did not seek to collect on the Notes until after the bankruptcy case was filed, it somehow waived its right to collect under the Notes. "The Massachusetts standard for waiver is an uncompromising one. "A finding of waiver must be premised upon 'clear, decisive, and unequivocal conduct on the part of an authorized representative…indicating that [it] would not insist on adherence to the [agreement].'" See Dunkin Donuts Inc. v. Panagakos, et al., 5 F. Supp. 2d 57, 60 (D. Mass. 1998) (quoting Paterson-Leitch Company, Inc. v. Massachusetts Electric, 840 F.22d 985, 992 (1st Cir. 1998)); see also St. John Brothers Company v. Falkson, 237 Mass. 399, 402 (1920). ("Waiver is the voluntary relinquishment of a known right.").

The Defendant's waiver argument fails for, at least, two (2) reasons. First, the Notes expressly provide that they "may not be changed orally, but only by an agreement in writing signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought." See Exhibit D to Harris Aff. The Defendant has not (and cannot) produce any such written agreement. The Defendant testified that he actually tried to obtain a letter from Fabbricatore but was unsuccessful:

> Q.     Have you spoken with Bob Fabbricatore at all since you left CTC?
> A.     Yes, I went to New Hampshire to see him for an hour.  It was probably in October, November just after I was laid off.
> Q.     Okay.

15

>   A. And that's when I saw him.
>   Q. What was the purpose of that visit?
>   A. The purpose of the visit was to ask him to sign a letter recognizing that what I shared with you was what he shared with me so many times.
>   Q. So you went to New Hampshire asking him to memorialize this forgiveness, this understanding of forgiveness that you and him had.
>   A. Yes.
>   Q. Did he sign that letter?
>   A. No. He referred me to his lawyer.
>   Q. And who was that?
>   A. At that time was Len Glass but when I called Len Glass, he was laid off so that it was not his lawyer any more and I left it without follow up.

See Kunzi Tr., pp. 68-69.

Second, the Notes further provide that the Defendant "waives demand, presentment, protest, notice of protest and/or dishonor and all other notices or requirements that might otherwise be required by law." See Exhibit D to Harris Aff. Accordingly, CTC had no obligation to make a demand upon the Defendant at any particular time, if at all. See Goldman v. Peterson, 1997 WL 724662, at *1 n. 2 (Mass. App. Div. Nov. 13, 1997) (no waiver of the creditor's right to timely payment where the promissory note expressly provided that "[n]o delay or omission of the holder in exercising any right or remedy hereunder shall constitute a waiver of any such right or remedy." )

In Fiumara v. Carpinteri, the court addressed the issue of whether the plaintiff had forgiven the defendant's debt in the context of the plaintiff's sale of his interests in a real property trust to the defendant. See 2005 WL 1335151, at 4 (Mass. Sup. Ct. May 11, 2005). According to the defendant, the forgiveness of the debt was "clear from the conduct of the parties," as the plaintiff sought no payments from the defendant after the sale and sent no notices of deficiency to him. See id. The court rejected this argument based on a failure to pursue collection of the debt, noting that, given the informal and

16

often paperless business relationship between the parties, it would be "more remarkable if [the plaintiff] had sent notices of deficiency ... [h]is conduct in not doing so is hardly noteworthy." See id.

Given the fact that the Defendant does not dispute that he signed each of the Notes and, more importantly, there is no evidence, much less a preponderance, to disprove liability under said Notes, summary judgment should enter in favor of the Trust.

## IV.  CONCLUSION

For all of the foregoing reasons, the Trust respectfully requests that this Court (1) enter summary judgment in favor of the Trust on all counts of the complaint; and (2) enter such other and further relief as the Court deems just under the circumstances.

Dated: October 30, 2006   Respectfully submitted,

**THE CTC LITIGATION TRUST**

By its attorneys,
/s/ Robert L. Harris
William R. Baldiga (BBO #542125)
Robert L. Harris (BBO #644829)
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA  02111
(617) 856-8200

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

Paul M. Glickman, Esquire
Glickman & Turley
250 Summer Street
Boston, MA  02210

/s/ Robert L. Harris
Robert L. Harris

# 1409318 v1 - HARRISRL - 024183/0001